JS-6, O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE WATERS,<br><br>             Plaintiff,<br><br>      v.<br><br>NOTORIOUS MEDIA, LLC, et al.,<br><br>             Defendants. | Case No.: 2:21-cv-08623-MEMF(ASx)<br><br>**ORDER AND JUDGMENT GRANTING PLAINTIFF SHANE WATERS'S MOTION FOR DEFAULT JUDGMENT [ECF NO. 33]** |

Before the Court is Plaintiff Shane Waters's Motion for Default Judgment. ECF No. 33. On June 30, 2022, the Court held a hearing on the Motion. ECF Nos. 52, 53.

For the reasons stated herein, the Court GRANTS the Motion for Default Judgment.

/ / /

/ / /

1

# BACKGROUND

## I. Factual Background[1]

Plaintiff Shane Waters ("Waters") is a podcast host located in Wabash, Indiana. Compl. ¶ 8. He is best known for his podcasts[2] "Foul Play" and "Hometown History." *Id.*

Defendants Notorious Media, LLC ("Notorious Media") and Notorious Holdings, LLC ("Notorious Holdings") are companies headquartered in Los Angeles, California. *Id.* ¶ 9. Defendant Peter Vincer ("Vincer") is the primary principal and CEO of Notorious Media and Notorious Holdings (collectively, the "Notorious Defendants"). *Id.* ¶ 10.

On March 26, 2020, Waters and Notorious Media entered into a contract (the "Agreement") in which Notorious Media agreed "to manage and sell advertising" for Waters's podcasts. *Id.* ¶ 22; ECF No. 1, Ex. A (the "Agreement"). As a part of the Agreement, Notorious Media was to act as Waters's administrator for all advertising revenue, meaning that Notorious Media would collect advertising revenue from Waters's podcast sponsors. Compl. ¶ 22. Waters was to receive 80 percent of all advertising revenue and Notorious Media retained 20 percent of the revenue as a commission. *Id.* ¶ 23. The Agreement also allowed Notorious Media to display the logos for Waters's podcasts "Foul Play" and "Hometown History" ("Waters's Podcast Logos") under the "networks shows" section of its website, https://notorious.llc/shows. *Id.* ¶¶ 31–32.

In or about February 2021, Waters learned that Notorious Media, in violation of the Agreement, was improperly withholding advertising revenue. *Id.* ¶ 25. In or about June 2021, after multiple requests that Notorious Media remit the appropriate amounts of revenue, Waters, in accordance with the Agreement's terms, gave the Notorious Defendants written notice, informing them that failure to cure their breach within ten days would result in termination of the Agreement. *Id.* ¶ 27. The Notorious Defendants failed to cure within the allotted period and the Agreement was subsequently terminated. *Id.* ¶ 28. The Agreement specified that upon termination, Notorious Media

---

[1] Unless otherwise indicated, the following facts are derived from the Complaint. ECF No. 1 ("Compl.").
[2] A "podcast" is "a program (as of music or talk) made available in digital format for automatic download over the Internet." *Podcast*, Merriam-Webster, https://www.merriam-webster.com/dictionary/podcast (last visited June 22, 2022).

was to "remit payment to [Waters] of any Compensation that is due and payable as of the date of such expiration or termination" which, at the time of the termination, was calculated to be at least $750,000. *Id.* ¶¶ 29–30. Waters has yet to receive a payment in this amount. *Id.* ¶¶ 26, 30. Further, despite the termination of the Agreement, Notorious Media continues to display Waters's Podcast Logos on its website. *Id.* ¶ 32.

## II. Procedural History

On November 1, 2021, Waters filed a complaint asserting three causes of action: (1) Breach of Contract; (2) Trademark Infringement under the Lanham Act, 15 U.S.C. § 1114; and (3) Trademark Infringement under the Lanham Act, 15 U.S.C. § 1125. *See generally id.* Waters appropriately filed proofs of service on each of the defendants. *See* ECF Nos. 8, 13, 22. After each defendant failed to respond, Waters filed Requests for the Clerk to enter default judgment on each defendant. *See* ECF Nos. 15, 23, 29. Each request was granted pursuant to Federal Rule of Civil Procedure 55(a). ECF Nos. 16, 24, 30.

On April 25, 2022, Waters filed the instant Motion requesting default judgment. ECF No. 33 ("Mot."). On April 26, 2022, the Court ordered Waters to provide the defendants with notice of the June 30, 2022 hearing on this Motion and to file a proof of service indicating the date, time, and manner of service no later than June 23, 2022. ECF No. 35. On May 11, 2022, Waters filed the Court's requested proofs of service. ECF Nos. 43, 44, 45. On June 30, 2022, the Court heard oral argument on the Motion. ECF Nos. 52, 53.

## III. Applicable Law

Federal Rule of Civil Procedure 55(b) authorizes a district court to grant default judgment after the Clerk of the Court enters default under Rule 55(a). FED. R. CIV. P. 55(b). Local Rule 55-1 requires the party seeking default judgment to file a declaration establishing: (1) when and against what party the default was entered; (2) the pleading on which default was entered; (3) whether the defaulting party is an infant or incompetent person, and if so, whether that person is represented by a general guardian, committee, conservator, or other like fiduciary who has appeared; (4) that the Servicemembers Civil Relief Act does not apply; and (5) that the defaulting party was properly served with notice. C.D. Cal. L.R. 55-1.

Once default has been entered, the well-pleaded factual allegations in the complaint, except those concerning damages, are deemed admitted by the non-responding party. *See* FED. R. CIV. P. 8(b)(6); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987). However, default judgment is not automatic upon the Clerk's entry of default; rather, it is left to the sound discretion of the court. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092–93 (9th Cir. 1980). When deciding whether to enter default judgment, courts consider seven factors, commonly known as the *Eitel* factors:

> (1) the possibility of prejudice to the plaintiff; (2) the merits of plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake in the action; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits.

*Eitel v. McCool*, 782 F.2d 1470, 1471–72 (9th Cir. 1986).

"Well-pleaded allegations" require "sufficient factual matter . . . to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It requires "more than a sheer possibility that a defendant has acted unlawfully" but does not require "detailed factual allegations." *Id.* Instead, the plaintiff need only show more than "threadbare recitals of the elements of a cause of action." *Id.* "Determining whether a complaint states a plausible claim for relief is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679).

**IV. Discussion**

**A. Waters has satisfied the procedural requirements of Local Rule 55-1.**

The Clerk of the Court entered default against the Notorious Defendants on December 27, 2021, January 25, 2022, and February 23, 2022. ECF Nos. 16, 24, 30. The Notorious Defendants have not responded to the Complaint or otherwise defended the action. Pursuant to Local Rule 55-1, Waters submitted a declaration from counsel establishing that Defendants are corporate entities and not minors, infants, or otherwise incompetent persons, and that the Servicemembers Civil Relief Act does not apply. ECF No. 33-2 ¶ 3. Finally, Waters served the Notorious Defendants with a copy of

this Motion. *Id.* ¶ 4. As such, the Court finds Waters has complied with the procedural requirements of Local Rule 55-1.

### B.  The *Eitel* factors weigh in favor of granting default judgment.

#### i.  Waters would suffer prejudice without a default judgment.

The first *Eitel* factor requires the Court to consider the harm to a plaintiff in the absence of default judgment. *See Eitel*, 782 F.2d at 1471. Waters argues that the Notorious Defendants have breached the Agreement both by failing to remit the required amount to Waters and by continuing to display Waters's Podcast Logos on Notorious Media's website. Mot. at 19. As such, Waters asserts that "absent injunctive relief through a default judgment, Waters would be without a remedy to stop this continuing infringement." *Id.* Defendants failed to appear to contest this allegation.

Taking the well-pleaded factual allegations as true—as this Court must, given that the Clerk has entered default—Waters will be prejudiced if the Court does not grant default judgment. Accordingly, the Court finds that this factor weighs in favor of default judgment.

#### ii.  The Court finds that Waters's complaint is sufficient and that the claims alleged therein are meritorious.

The second and third *Eitel* factors consider the substantive merits and sufficiency of the complaint. *See Eitel*, 782 F.2d at 1471. Notwithstanding the entry of default, the Court must still determine whether the facts alleged give rise to a legitimate cause of action because "claims [that] are legally insufficient . . . are not established by default." *Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992). Waters maintains that he has sufficiently pleaded each of the claims set forth in his Complaint. Mot. at 9.

Under California law, "common principles apply regardless of whether the alleged alter ego is based on piercing the corporate veil to attach liability to a shareholder or to hold a corporation liable as part of a single enterprise." *Id.* at 1108. Accordingly, common principles apply to the question of whether to pierce the corporate veil to attach liability to Vincer as well as to the question of whether to pierce the corporate veil to hold Notorious Holdings liable as part of a single enterprise with Notorious Media.

/ / /

1. *Waters has sufficiently pleaded a breach of contract claim as to Notorious Media.*

To prevail on a breach of contract claim under California law, a plaintiff must establish: "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 250 P.3d 1115, 1121 (Cal. 2011). A valid contract exists if the parties to the contract are capable of contracting, both parties consent to the contract's terms, a lawful object is present, and sufficient consideration exists. *United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 462 (9th Cir. 1999).

Waters pleads breach of contract against Notorious Media. Mot. at 19–22. The Court finds that Waters has made a sufficient showing of each factor in relation to Notorious Media. First, the Complaint sufficiently alleges the presence of a contract in the form of the Agreement. *See* Compl. ¶¶ 1, 7, 22–29. Next, Waters alleges that he performed his obligations under the Agreement, *id.* ¶ 35, but that the Notorious Defendants failed to perform their obligations by failing to remit the appropriate percentage of revenue to Waters. *Id.* ¶¶ 22–29. Finally, Waters has alleged that the Notorious Defendants' breach resulted in damages of at least $376,178.42. Mot. at 20. Accordingly, the Court finds that Waters has sufficiently pleaded his breach of contract claim.

2. *Waters has sufficiently alleged alter ego liability as to Vincer, but not as to Notorious Holdings.*

Waters also argues that Vincer and Notorious Holdings are both liable for breach of contract due to alter ego liability. *See* Mot. at 21 (citing Compl. ¶¶ 1–2, 4–5, 14). Although the well-pleaded factual allegations in the Complaint are deemed to be true, conclusory allegations are not. *Iqbal*, 556 U.S. at 678. A description of the law governing alter ego liability is in order at this juncture to determine which of these allegations can fairly be considered well-pleaded factual allegations and which are not.

With respect to attaching liability to a shareholder, "[t]he alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests. In certain circumstances the court will disregard the corporate entity and will hold the individual shareholders liable for the actions of the corporation." *Mesler v.*

*Bragg Mgmt. Co.*, 702 P.2d 601, 606 (Cal. 1985). A plaintiff must allege two elements for the doctrine to be invoked: (1) "there must be such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist"; and (2) "there must be an inequitable result if the acts in question are treated as those of the corporation alone." *Sonora Diamond Corp. v. Super. Ct.*, 99 Cal. Rptr. 2d 824, 836 (Ct. App. 2000). Put another way, courts consider whether the "corporation is . . . controlled by the individual sought to be held [liable] and [whether] recognition of the separate existence of the controlled corporation would work a fraud or injustice." *O'Donnell v. Weintraub*, 67 Cal. Rptr. 274, 278 (Ct. App. 1968).

Similarly, with respect to holding a corporation liable as part of a single enterprise, "[a] court may . . . disregard the corporate form in order to hold one corporation liable for the debts of another affiliated corporation when the latter is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunct of another corporation." *Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 159 Cal. Rptr. 3d 469, 479 (Ct. App. 2013) (internal quotation marks omitted). "[W]here there is such domination of finances, policies and practices that the controlled corporation has . . . no separate mind, will or existence of its own and is but a business conduit for its principal, the affiliated corporations may be deemed to be a single business enterprise, and the corporate veil pierced." *Id.* at 480 (internal citations and quotation marks omitted).

With this in mind, the Court turns to the allegations in the Complaint. A number of the allegations are clearly conclusory and merely a recitation of the elements or factors of alter ego liability. For example, the allegation in the Complaint that "Notorious [Media] and Vincer are alter egos of one another and of [Notorious Holdings]," Compl. ¶ 2, is a legal conclusion which this Court need not accept as true on a motion for default judgment. Similarly, the allegation that "there is a substantial unity of interest among all Defendants," *id.* ¶ 14, is also a legal conclusion that the Court need not accept as true.

However, the following are well-pleaded factual allegations which the Court accepts as true:

> *Id.* ¶ 2: "Notorious [Media] and its Chief Executive Officer [Vincer] absconded with Waters' monies in order to fuel Vincer's reportedly luxurious and debaucherous lifestyle . . . ."

7

> *Id.* ¶ 4: "Vincer signed a lease for a mansion—referred to as the "Notorious Estate"—which Defendants paid for my converting monies collected by Defendants on Waters' behalf from Waters' advertisers."
>
> *Id.* ¶ 14: "Vincer is the primary principal and CEO of Notorious [Media] and Notorious Holdings."
>
> *Id.*: "Vincer exercises complete control over and dominates Notorious [Media] and Notorious Holdings in all substantive matters, including, but not limited to, the hiring of their officers, the ultimate authority to enter into contracts (including, *inter alia*, the contract with [Waters] with respect to the conduct complaint of herein), the ultimate authority concerning the direction and strategy of litigation, and the control over the distribution and disbursement of assets (for example, upon information and belief, Vincer's treating of Notorious [Media]'s and Notorious Holdings' bank accounts as his own personal "piggy bank" and commingling of his personal assets with [Notorious Media's] and Notorious Holdings' assets)."
>
> *Id.*: "Vincer holds himself out as the equivalent of Notorious [Media] and Notorious Holdings."

The Court finds that these well-pleaded factual allegations, taken as true, establish both a unity of interest between Vincer and Notorious Media. They also establish that to allow Notorious Media to rely on the corporate form would yield an "inequitable result" and "work a fraud or injustice." *Sonora Diamond Corp.*, 99 Cal. Rptr.2d at 836; *O'Donnell*, 67 Cal. Rptr. at 278. Accordingly, the Court finds that Waters has sufficiently alleged an alter ego relationship between Vincer and Notorious Media.

Although Waters has sufficiently alleged an alter ego relationship between Vincer and Notorious Holdings, the Court finds that he has not sufficiently alleged an alter ego relationship between Notorious Media and Notorious Holdings. The Complaint does not allege the nature of the relationship between the two companies or permit this Court to find that they were treated as one enterprise.[3] *See Toho-Towa Co. v. Morgan Creek Prods., Inc.*, 159 Cal. Rptr. 3d 469, 479 (Ct. App. 2013).

/ / /

---

[3] At the hearing, counsel for Waters disclaimed the notion that simply finding that Vincer was the alter ego of both companies would be enough to find that the two companies were alter egos of each other. The Court therefore does not consider whether this theory might support a finding that Waters had properly alleged an alter ego relationship between Notorious Holdings and Notorious Media.

                     3. *Waters has sufficiently alleged a breach of Lanham Act claim.*

To assert a claim for trademark infringement, a plaintiff must show that: (1) it has a valid, protectable mark, and (2) the defendant's use of the mark is likely to cause consumer confusion. *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1022 (9th Cir. 2018); 15 U.S.C. § 1114(1)(a). Although there are some differences between a claim under § 1114 (trademark infringement) and § 1125(a) (false designation of origin), "the analysis under the two provisions is oftentimes identical." *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1047 n.8 (9th Cir. 1999). Furthermore, the Ninth Circuit "has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims under the Lanham Act." *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994); *see, e.g.*, *Rearden LLC v. Rearden Com., Inc.*, 683 F.3d 1190, 1221 (9th Cir. 2012) ("It is undisputed that Appellants' state law trademark infringement claim (as well as their claim under the UCL to the extent it is based on infringement grounds) is subject to the same legal standards as their Lanham Act trademark claim."). Therefore, the Court jointly analyzes Waters's claims for trademark infringement and false design of origin.

                     a. *Waters has sufficiently alleged that he holds a valid, protectable mark.*

Federal registration provides "prima facie evidence" of a trademark's validity and entitles the plaintiff to a "strong presumption" that the mark is protectable. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005). When proof of registration is uncontested, the ownership interest element of a trademark infringement claim is met. *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

Here, Waters contends that he is the owner of the federally registered trademark "Foul Play" and that he has continuously used the unregistered mark "Hometown History." Compl. ¶¶ 6, 39. The Notorious Defendants have not contested Waters's ownership of "Foul Play" and Waters has claimed ownership by providing the U.S. Trademark Registration number. *Id.* ¶ 6. Therefore, Waters is the presumed owner of the Foul Play mark.

In regard to the "Hometown History" mark, Waters contends that since or about June 2018, he has continuously used the mark "in connection with the production and interstate marketing and Internet dissemination of [his] 'Hometown History' podcasts." *Id.* ¶ 49. This continuous use, he argues, has rendered the mark as "either inherently distinctive" or has granted it "secondary meaning as it has come to indicate to relevant consumers the 'Hometown History' podcast, with [Waters] . . . as the source thereof." *Id.*

Secondary meaning is "the mental association by a substantial segment of consumers and potential consumers between the alleged mark and a single source of the product." *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (citations omitted); *Grupo Gigante SA De CV v. Dallo & Co.*, 391 F.3d 1088, 1095 (9th Cir. 2004) ("Secondary meaning refers to a mark's actual ability to trigger in consumers' minds a link between a product or service and the source of that product or service."). Secondary meaning may be thought of as a "learned association" or "an acquired distinctiveness." *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 824 (9th Cir. 1993). "If buyers take the word to refer only to a particular producer's goods or services, it is not generic. But if the word is identified with all such goods or services, regardless of their suppliers, it is generic and so not a valid mark." *Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.*, 601 F.2d 1011, 1016 (9th Cir. 1979).

"Factors considered in determining whether a secondary meaning has been achieved include: (1) whether actual purchases of the product bearing the claimed trademark associate the trademark with the producer, (2) the degree and manner of advertising under the claimed trademark, (3) the length and manner of use of the claimed trademark and, (4) whether use of the claimed trademark has been exclusive." *Levi Strauss & Co.*, 778 F.2d at 1358 (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1015 (9th Cir. 1985)). "While evidence of a manufacturer's sales, advertising and promotional activities may be relevant in determining secondary meaning, the true test of secondary meaning is the effectiveness of this effort to create it." *Id.*

A plaintiff may establish secondary meaning through direct and circumstantial evidence. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 15:30 (5th ed. 2022). While

direct evidence, such as consumer surveys, are considered to be the most persuasive evidence, *see Levi Strauss & Co.*, 778 F.2d at 1358, circumstantial evidence such as "exclusivity, manner, and length of use, amount and manner of advertising, amount of sales and the number of customers, and plaintiff's established place in the market" is also considered persuasive. *Filipino Yellow Pages, Inc. v. Asian J. Publ'ns, Inc.*, 198 F.3d 1143, 1150–51 (9th Cir. 1999).

Here, the Court finds that Waters has sufficiently alleged secondary meaning. First, Waters alleges that his Hometown History podcast averages roughly 600,000 downloads per an episode. Compl. ¶ 31. This implies that podcast listeners, or customers, associate the "Hometown History" podcast name with Waters specifically. Next, in regard to the degree and manner of advertising, Waters alleges that he has consistently used the "Hometown History" mark since 2018. *See id.* ¶ 49. Accordingly, the Court finds that Waters has sufficiently alleged the creation of a secondary meaning in the "Hometown History" mark.

### b. *Waters sufficiently shows a likelihood of confusion.*

Next, the Court must consider "whether an alleged trademark infringer's use of a mark creates a likelihood that the consuming public will be confused as to who makes what product." *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008) (citation and internal quotation marks omitted). When determining the likelihood of confusion, the Ninth Circuit considers eight factors, commonly known as the *Sleekcraft* factors: (1) the strength of the marks; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; 6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348–49 (9th Cir. 1979), *abrogated by Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792 (9th Cir. 2003).

In the context of the Internet, the Ninth Circuit has held that "the three most important *Sleekcraft* factors are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the simultaneous use of the Web as a marketing channel" ("Web Factors"). *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir. 2000) (citation omitted).

Waters has set forth allegations that speak to all three Web factors. First, with respect to the similarity of the marks, Waters has alleged that the marks are identical as the Notorious Defendants display Waters's Podcast Logos on their website which are identical to the Waters's Podcast Marks. Compl. ¶¶ 6, 32, 38–57. Next, regarding the relatedness of goods and services, both Waters and the Notorious Defendants are engaged in podcasts; Waters's Podcast Marks are affiliated with Waters's podcasts; and the Notorious Defendants' website advertises Waters's podcasts and other similar podcast shows. *See id.* ¶ 32. Finally, in regard to use of the Web as a marketing channel, as podcasts are solely hosted on the Internet, both Waters and the Notorious Defendants use the Web as their primary marketing channel. *See supra* n.2; Compl. ¶¶ 31–32. As Waters has met the three Web Factors, the Court finds that Waters has sufficiently established the merits of its claims for trademark infringement and false designation of origin.

        c.   *As a license is an affirmative defense, the Court does not consider the potential presence of a license in its analysis.*

Here, however, Waters has granted the Notorious Defendants license to display the Podcast Marks on the Notorious Media website. *See* the Agreement. At the June 30, 2022 hearing, the Court ordered Waters to submit supplemental briefing regarding the "issue of whether the existence of a license is an affirmative defense for which the defense bears the burden." Minute Order, ECF No. 53. In his resultant briefing, Waters makes the following three arguments: (1) a "license" is an affirmative defense under Federal Rule of Civil Procedure 8(c)(1); (2) insofar as the Agreement constituted a license, the Agreement terminated ten days following Waters's written notice of breach; (3) any implied license would have terminated upon the commencement of this action. Supplemental Brief, ECF No. 51 ("Supp. Br.") at 2–4.

Principles of copyright law and Rule 8(c)(1) of the Federal Rules of Civil Procedure provide that a license is an "affirmative defense," and thus must be raised by the defendant. FED. R. CIV. P. 8(c)(1); *Worldwide Church of God v. Phila. Church of God, Inc.*, 227 F.3d 1110, 1114–15 (9th Cir. 2000) ("The existence of a license creates an affirmative defense to a claim of copyright infringement."). Thus, as the defendant "bears the burden of proving an affirmative defense," *Affirmative Defense*, BLACK'S LAW DICTIONARY (11th ed. 2019), failure to raise such a defense "effects a waiver." *In re Adbox, Inc.*, 488 F.3d 836, 841 (9th Cir. 2007). As a result, the Court finds

that the presence of a copyright license—either implied or express—has no bearing on its analysis at the default judgment stage and does not address the remainder of Waters's arguments.

In sum, the Court finds that these two *Eitel* factors—merits of the claim and sufficiency of the complaint—therefore point towards granting default judgment.

### iii. The sum of money at stake is reasonable.

In evaluating this factor, the Court must balance the amount of money at stake in relation to the seriousness of Defendants' conduct. *See Eitel*, 782 F.2d at 1471–72.

#### 1. *Waters is entitled to compensatory damages for his breach of contract claim.*

Waters seeks $376,178.42 in compensatory damages on his breach of contract claim. Mot. at 25. This amount is derived from the unpaid 80 percent share of the ad revenue collected by the Notorious Defendants under the Agreement. *Id.* at 22.

While the requested sum is large, the Court finds that the amount is reasonable as it will put Waters "in as good a position as [he] would have been had performance been rendered as promised." *Richards v. Sequoia Ins. Co.*, 124 Cal. Rptr. 3d 637, 641 (Ct. App. 2011). Here, the factual allegations in the Complaint reflect that the Agreement's terms guaranteed Waters an 80 percent remittance on the amount generated by the Notorious Defendants through ad revenue. Compl. ¶ 23. The $376,178.42 amount is supported through data pages and invoices listing the specific ad revenue generated from each specific advertiser during the relevant period. *See* Declaration of Shane Waters, ECF No. 33-1 ("Waters Decl."), Exs. A–B; Waters Decl. ¶¶ 6, 8.

#### 2. *Waters is entitled to pre- and post-judgment interest.*

Waters also seeks pre- and post-judgment interest on the compensatory award of $376,178.42. Mot. at 26.

##### a. Pre-judgment interest.

"In diversity cases, state law governs the award of prejudgment interest." *Lund v. Albrecht*, 936 F.2d 459, 464 (9th Cir. 1991) (citations omitted). California Civil Code Section 3289(b) provides "[i]f a contract entered into after January 1, 1986, does not stipulate a legal rate of interest,

the obligation shall bear interest at a rate of 10 percent per annum after a breach." CAL. CIV. CODE § 3289(b).

The Court finds that Waters is entitled to pre-judgment interest. First, Waters and the Notorious Defendants entered into the Agreement on March 26, 2020. *See* the Agreement. Next, the Agreement does not provide for an interest rate in the event of either party's breach. Accordingly, Section 3289(b) applies, and Waters is entitled to prejudgment interest in the amount of 10 percent per annum, totaling $41,739.30.[4]

### b. Post-judgment interest

"[P]ost-judgment interest is determined by federal law." *Northrop Corp. v. Triad Int'l Mktg., S.A.*, 842 F.2d 1154, 1155 (9th Cir. 1988). 28 U.S.C. § 1961 provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). Post-judgment interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." *Id.*

Here, Waters seeks post-judgment interest at the rate set forth by federal law. The record provides no countervailing evidence setting post judgment interest at a different amount.

Accordingly, the Court finds that Waters is entitled to the amount permitted by Section 1961(c).

### iv. There is little possibility of dispute.

The fifth *Eitel* factor requires the Court to consider the possibility of dispute about material facts in the case. *See Eitel*, 782 F.2d at 1471–72. Generally, where a complaint is well-pleaded and the defendants make no effort to respond, this factor weighs in favor of default judgment.

Though the Notorious Defendants have not responded to this action, there is no indication from the Complaint nor Waters's motion that there are any facts in dispute. Upon entry of default, all well-pleaded facts in the complaint are taken as true, except those relating to damages. *TeleVideo Sys., Inc.*, 826 F.2d at 917–18. There is also no indication that the Notorious Defendants might have

---

[4] This amount is calculated starting from the end of the ten-day cure period on July 8, 2021, to the date of entry of Judgment.

a strong affirmative defense of license, keeping in mind the well-pleaded allegations about how that license was breached. Having considered the low likelihood of disputed facts, the Court finds this factor to weigh in favor of default judgment.

    v. <u>The Court is unable to conclude whether there is excusable neglect.</u>

The sixth *Eitel* factor considers the possibility that the default resulted from excusable neglect. *See Eitel*, 782 F.2d at 1472.

Here, Waters alleges he has made numerous attempts to serve the Notorious Defendants with the Complaint, summons, and this motion for default judgment. *See supra* Section II. Absent any further information, the Court is unable to conclude whether the Notorious Defendants' failure to respond is due to excusable neglect.

    vi. <u>Policy favoring resolution on the merits weighs against granting default judgment.</u>

The Ninth Circuit's "starting point is the general rule that default judgments are ordinarily disfavored. Cases should be decided upon their merits whenever reasonably possible." *Eitel*, 782 F.2d at 1472. Therefore, the policy favoring resolution on the merits weighs against granting default judgment.

Taken as a whole, the Court finds that the *Eitel* factors weigh towards granting default judgment against the Notorious Defendants.

## V. Remedies

### A. The Court grants the request for permanent injunction.

Having found in favor of granting default judgment, the Court next considers whether it should award Waters a permanent injunction against the Notorious Defendants. Waters seeks a permanent injunction "requiring [the Notorious Defendants] to remove the Waters'[s] Podcast Logos from Defendants' website and cease and desist from any advertising of Waters'[s] podcasts or from otherwise suggesting any continued connection, affiliation, and/or association with Waters and/or Waters'[s] podcasts." Compl. at Prayer ¶ C.

The Lanham Act "vests the district court with the power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation

of any right of the trademark owner." *Reno Air Racing Ass'n v. McCord*, 452 F.3d 1126, 1137 (9th Cir. 2006) (citing 15 U.S.C. § 1116). A party seeking a permanent injunction must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of the hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 879 (9th Cir. 2014) (citations omitted). The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

As previously discussed, Waters has shown that he is entitled to judgment on each of his claims, including his claim for federal trademark infringement under the Lanham Act. Here, Waters is entitled to a presumption of irreparable harm because he has demonstrated a likelihood of success on the merits. *See* 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction"). If an injunction were not granted, Waters would suffer irreparable injury from the ongoing damages to its goodwill and diversion of customers to similar products. Furthermore, the balance of hardships favors Waters because without an injunction, Waters will lose profits and goodwill, while the Notorious Defendants will only be inhibited from carrying on its infringing activities. Finally, an injunction is in the public interest because "[t]he public has an interest in avoiding confusion between two companies' products." *Internet Specialties W., Inc. v. Milon–DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 n.5 (9th Cir. 2009). Accordingly, the Court concludes that Waters is entitled to a permanent injunction.

Thus, the Court GRANTS Waters's request for permanent injunction, as to the relief actually pleaded in its Complaint. *See* Compl. at Prayer ¶ C; Mot. at 27–28.

### B. The Court grants the request for costs.

Waters requests that the Court award costs of suit in the amount of $1,324.50, consisting of the $402 filing fee to initiate this action and $922.50 in process server fees. Mot. at 27. Under Federal Rule of Civil Procedure 54(d)(1), a plaintiff prevailing on a motion for default judgment is

entitled to costs other than attorneys' fees. Accordingly, the Court GRANTS Waters's request for the costs of suit incurred herein, in the amount of $1,324.50. *See* Mot. at 27.

### C. The Court denies the request for attorneys' fees.

Waters seeks an award of attorneys' fees under the Lanham Act given that he has properly stated claims for relief under the Lanham Act. Mot. at 26. And rather than supporting such an award with evidence, Waters relies on Local Rule 55-3 which sets forth a specific schedule for calculating attorneys' fees awards on default judgment in circumstances when "[an] applicable statute provides for the recovery of reasonable attorneys' fees." C.D. Cal. L.R. 55-3. Mot, at 27. Accordingly, Waters requests that the Court award attorneys' fees in the amount of $11,859.41 which represents the proper calculation under the schedule (assuming pre-judgment interest through the June 30, 2022 hearing date). *Id.*

As previously discussed, Waters only requests and has presented evidence in support of compensatory damages stemming from his *breach of contract claim* (in an amount totaling $376,178.42) plus interest on that damages award. Although he alleges violations of the Lanham Act, and this Court is entering default judgment on his behalf with respect to the alleged violations of the Lanham Act, Waters has not presented evidence of damages under the Lanham Act, and the Court's judgment as set forth in this Order does not include a monetary judgment with respect to the Lanham Act. Accordingly, the schedule in the Local Rules is inapplicable, as it would only apply where a plaintiff obtained damages pursuant to the Lanham Act. The plain meaning of the Local Rule supports this:

> **L.R. 55-3 Default Judgment - Schedule of Attorneys' Fees.** When a promissory note, contract or applicable statute provides for the recovery of reasonable attorneys' fees, those fees shall be calculated according to the following schedule:
>
> | Amount of Judgment | Attorneys' Fees Awards |
> |---|---|
> | $0.01 - $1,000 | 30% with a minimum of $250.00 |
> | $1,000.01 - $10,000 | $300 plus 10% of the amount over $1,000 |
> | $10,000.01 - $50,000 | $1200 plus 6% of the amount over $10,000 |
> | $50,000.01 - $100,000 | $3600 plus 4% of the amount over $50,000 |
> | Over $100,000 | $5600 plus 2% of the amount over $100,000 |
>
> This schedule shall be applied to the amount of the judgment exclusive of costs.

C.D. Cal. L.R. 55-3. The plain meaning is that this schedule is applied to the amount of the judgment pursuant to the promissory note, contract, or applicable statute. It would be anomalous—and this Court suggests, unjust—to calculate attorneys' fees based upon a judgment that was not rendered pursuant to a promissory note, contract, or applicable statute. In theory, it could result in a party obtaining an attorneys' fees award on a claim that in no way reflects either the recovery on the claim or the work put into prosecuting the claim. Even if Waters's reading of the rule was proper, this Court finds that this would not constitute a "reasonable" attorneys' fees award under the Lanham Act and would deny it on that basis. Accordingly, this Court DENIES the request for attorneys' fees.

## VI. Conclusion

For the reasons stated above, the Court GRANTS Waters's Motion for Default Judgment. IT IS HEREBY ORDERED that:

(1) Judgment be entered in favor of Waters on his claims for breach of contract and trademark infringement under the Lanham Act, 15 U.S.C. § 1117(a);

(2) The Notorious Defendants must remove the logos for Waters's podcasts "Foul Play" and "Hometown History" from the https://notorious.llc website within seven (7) days of this Order;

(3) The Notorious Defendants and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with any one or more of them are permanently restrained and enjoined from advertising Waters's podcasts or from otherwise suggesting any continued connection, affiliation, and/or association with Waters and/or Waters's podcasts;

(4) All defendants shall be jointly and severally liable to Waters in the amount of $419,242.22, which is comprised of:

    (a) $376,178.42 in compensatory damages;

    (b) $41,739.30 in pre-judgment interest; and

    (c) $1,324.50 in costs;

(5) Waters shall also recover post-judgment interest from the Notorious Defendants, jointly and severally, at the rate of 3.28 percent per annum,[5] which is the "rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of th[is] judgment." 28 U.S.C. § 1961(a).

IT IS SO ORDERED.

Dated: August 17, 2022

_____
MAAME EWUSI-MENSAH FRIMPONG
United States District Judge

---

[5] *See* "Current Applicable Rates," Administrative Office of the U.S. Courts, https://www.uscourts.gov/services-forms/fees/post-judgment-interest-rate (last visited Aug. 17, 2022) ("Under each of the above statutes [including 28 U.S.C. § 1961] the rate of interest used in calculating the amount of post judgment interest is the weekly average 1-year constant maturity (nominal) Treasury yield, as published by the Federal Reserve System. . . . . Additionally, as of October 11, 2016, the Board no longer publishes the H.15 [the Federal Reserve Board Selected Interest Rates statistical release] in PDF format or publish weekly and monthly averages directly on the H.15. Weekly and monthly averages continue to be available through the Board's Data Download Program."); "Data Download Program," Board of Governors of the Federal Reserve System, https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H.15 (last visited Aug. 17, 2022) (applicable data pulled for the week of August 12, 2022).